IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ERWIN TOBAR-BARRERA, | * | |
| Plaintiff, | * | |
| | | Civil No. RDB 09-3064 |
| v. | * | Civil No. RDB 10-0176 |
| JANET NAPOLITANO, | * | |
| ERIC H. HOLDER, Jr., | | |
| IRA SHOCKLEY, | * | |
| CALVIN McCORMICK, | | |
| GEORGE W. MAUGANS, III, | * | |
| Defendants. | * | |
| | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

Petitioner Erwin Tobar-Barrera, a native and citizen of Guatemala, challenges his detention and pending removal from the United States by means of two separate cases now consolidated—a petition for writ of habeas corpus (Civil No. RDB 09-3064), and an action for declaratory and injunctive relief (Civil No. RDB 10-0176). Government Defendants[1] have filed responses in opposition to Tobar-Barrera's submissions and a hearing was held on February 22, 2010.[2] The central question raised by this litigation is whether Tobar-Barrera is eligible for the

---

[1] Five officials are named as Defendants: Janet Napolitano, Secretary of the Department of Homeland Security; Eric H. Holder, Jr., United States Attorney General; Ira Shockley, Director of the Worcester County Detention Center; Calvin McCormick, Field Office Director of the Office of Detention and Removal; and George W. Maugans, III, Chief Counsel of Immigration and Customs Enforcement of the Department of Homeland Security.

[2] Tobar-Barrera filed a Petition for Writ of Habeas Corpus and a separate Complaint for Declaratory and Injunctive Relief. Defendants have filed responses in opposition to both of Tobar-Barrera's submissions. Oral argument was heard on these matters at the hearing on February 22, 2010. This Court has consolidated the two cases and is prepared to rule on Tobar-Barrera's submissions.

benefits provided under the consent decree set forth and approved in *American Baptist Churches v. Thornburgh*, 760 F. Supp. 797 (N.D. Cal. 1991). For the reasons stated below, this Court answers this question in the affirmative and enters a declaratory judgment that the government improperly denied Tobar-Barrera of his right to a de novo asylum adjudication, as guaranteed by that consent decree, after an unexplained delay of almost sixteen years.[3] In addition, Defendants are compelled to provide Tobar-Barrera with a de novo asylum adjudication, which must be initiated within 30 days of the date of this Memorandum Opinion and accompanying Order.

## BACKGROUND

Erwin Tobar-Barrera ("Tobar-Barrera" or "petitioner") was born in Guatemala City, Guatemala on March 1, 1961. (Complaint for Declaratory and Injunctive Relief ¶ 9.) In the late 1970s, he fled civil war in his homeland and he eventually entered the United States in 1984. (*Id.*) In 1986, he was convicted after pleading guilty to armed manslaughter in violation of Title 22 of the District of Columbia Code, Sections 2401 and 3202. (*Id.* ¶ 10.) In April of 1990, the Immigration and Naturalization Service ("INS")[4] issued Tobar-Barrera an Order to Show Cause charging him as being a deportable alien, Def.'s Ex. A, and Tobar-Barrera thereupon sought political asylum. (Compl. ¶ 11.)

On December 19, 1990, the United States District Court for the Northern District of California provisionally approved a settlement agreement to resolve a nationwide class action lawsuit challenging the United States' treatment of El Salvadoran and Guatemalan asylum seekers in *American Baptist Churches v. Thornburgh*, 760 F. Supp. 797 (N.D. Cal. 1991)

---

[3] At the hearing on February 22, 2010, government counsel could provide no satisfactory explanation for this sixteen-year delay.
[4] On March 1, 2003, many of the INS's functions were transferred to the newly-created Department of Homeland Security ("DHS").

(hereinafter referred to as the "ABC agreement").[5]  Under the ABC agreement, eligible class members were entitled to certain benefits, including a "*de novo*, unappealable asylum adjudication before an Asylum Officer."  (ABC agreement ¶ 2.)

On January 18, 1991, Tobar-Barrera signed a registration form requesting benefits under the ABC agreement.  (Compl. ¶ 13; Pl.'s Ex. A.)  Approximately one month later the INS made a bond re-determination and Tobar-Barrera was released on his own recognizance.  (Pl.'s Ex. B.)  On September 6, 1991, his immigration case was administratively closed by the Immigration Judge ("IJ") pursuant to paragraph 19 of the ABC agreement.  (Compl. ¶ 14.)

Tobar-Barrera's case remained inactive for almost sixteen years, as he awaited his opportunity to receive a de novo asylum adjudication.  (*Id.* ¶ 15.)  On or about May 16, 2007, the U.S. Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security ("DHS"), notified Tobar-Barrera that he was ineligible for ABC benefits.  (*Id.*)  The USCIS concluded that Tobar-Barrera's 1986 conviction for manslaughter classified as an "aggravated felony," rendering him ineligible for a de novo asylum adjudication under paragraph 2 of the ABC agreement.  (Pl.'s Ex. C.)  His removal proceedings were recalendared and on September 1, 2009, Tobar-Barrera was placed in detention without bond with U.S. Immigration and Customs Enforcement ("ICE").  (Compl. ¶¶ 16-17.)  ICE's "no bond" determination was sustained by the Immigration Judge, who issued a written decision on December 8, 2009, ordering that Tobar-Barrera be held in custody without bond.  (Def.'s Ex. D.)  Tobar-Barrera currently remains in ICE custody.  His next appearance before the Baltimore

---

[5] The consent decree was entered into by the parties in the underlying litigation.  Plaintiffs were comprised of a large number of Salvadoran and Guatemalan citizens in the United States.  The Defendants were Attorney General Richard L. Thornburgh, of the United States Department of Justice, Gene McNary, of the Immigration and Naturalization Service, and Secretary of State James A. Baker, III, of the United States Department of State. *See American Baptist Churches v. Thornburgh*, 760 F. Supp. 797, 799 (N.D. Cal. 1991).

Immigration Court, originally scheduled for February 3, 2010, has been postponed to April 14, 2010.

On November 16, 2009, Tobar-Barrera filed a petition for writ of habeas corpus challenging his detention and on January 25, 2010, he filed a complaint seeking declaratory and injunctive relief.  Tobar-Barrera seeks a declaratory judgment that he is entitled to ABC benefits, including a de novo asylum adjudication, and he seeks to enjoin the removal proceedings currently pending before the Baltimore Immigration Court.  (Paper No. 1).  In addition, he contends that the definition of "aggravated felony" set forth in section 321 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-546 (1996) ("IIRIRA"), is unconstitutionally retroactive as applied to him.

## JURISDICTION AND SCOPE OF RULING

Tobar-Barrera cites the federal habeas corpus statute, 28 U.S.C. § 2241, the Declaratory Judgment Act, 28 U.S.C. § 2201, and paragraph 35 of the ABC agreement as bases for this Court's jurisdiction in this matter.  In addition, he petitions for an entry of injunctive relief to bar the removal proceedings currently pending in the Baltimore Immigration Court.

As an initial matter, this Court finds that it lacks jurisdiction to consider his writ of habeas corpus under 28 U.S.C. § 2241.  While paragraph 36(e) of the ABC agreement states that "[n]othing in this provision shall limit class members' entitlement to seek judicial relief through habeas corpus to challenge his or her detention," there is no indication that Tobar-Barrera properly exhausted his administrative remedies before filing his petition.  *See Kurfees v. I.N.S.*, 275 F.3d 332, 336 (4th Cir. 2001) (noting that district courts lack jurisdiction over the habeas claims of aliens who fail to exhaust administrative remedies).

In addition, to the extent that Tobar-Barrera seeks to enjoin the pending removal proceedings, this Court is mindful that the Immigration and Nationality Act ("INA") restricts injunctive relief. As the Supreme Court has recently noted, the INA "sharply restricts the circumstances under which a court may issue an injunction blocking the removal of an alien from this country." *Nken v. Holder*, 129 S. Ct. 1749, 1754, 173 L. Ed. 2d 550 (2009). Section 1252(g) deprives courts of jurisdiction over challenges to government actions "to commence proceedings, adjudicate cases, or execute removal orders." *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (citing 8 U.S.C. § 1252(g)). As a result, this Court is not authorized to enjoin the removal proceedings currently pending before the Immigration Court.

Nevertheless, as the government concedes, this Court has jurisdiction to issue a declaratory judgment regarding Tobar-Barrera's eligibility for benefits under the ABC agreement.[6] The Declaratory Judgment Act provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act also grants a court discretionary authority to grant declaratory relief, which should be invoked, "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937). The Declaratory Judgment Act may not serve as an independent basis for federal subject-matter jurisdiction and can only provide a remedy where jurisdiction already exists. *Skelly Oil Co. v. Phillips Co.*, 339 U.S. 667, 671-72 (1950). However, in this case, Tobar-Barrera may rely upon

---

[6] Government counsel conceded, in their papers and at the hearing on February 22, 2010, that this Court has jurisdiction to determine whether the USCIS complied with the terms of the ABC agreement.

paragraph 35 of the ABC agreement as an independent basis for subject matter jurisdiction, because it entitles all class members under the Agreement "to seek enforcement of the provisions hereof by initiating a separate proceeding in any federal district court, and the Defendants will not contest the jurisdiction of such court to hear any such claim." *American Baptist Churches*, 760 F. Supp. at 810.

## DISCUSSION

### I.  Statutory Background

The question of whether Tobar-Barrera is eligible for ABC benefits depends upon a determination of the meaning of "aggravated felony," as it is defined in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*

The term "aggravated felony" was introduced into the INA by the Anti-Drug Abuse Act of 1988, which defined the term as "murder, and drug trafficking crime defined in section 924(c)(2) of Title 18, United States code, or any illicit trafficking crime defined in section 91 of such title, or any attempt of conspiracy to commit any such act, committed within the United States." Anti-Drug Abuse Act of 1988, Pub. L. 100-690, 102 Stat. 4181 (November 18, 1988), codified at 8 U.S.C. § 1101(a)(43). This definition was subsequently expanded to include "any crime of violence (as defined in section 16 of Title 18, not including a purely political offense) for which the term of imprisonment imposed (regardless of any suspension of such imprisonment) is at least 5 years." Immigration Act of 1990, § 501(a)(3), Pub. L. No. 101-649, 104 Stat. 5048 (November 29, 1990). However, the 1990 amendment had a prospective effect and only related to offenses committed on or after the amendment's November 29, 1990, effective date.

In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), substantially broadened the definition of aggravated felony to include "[a] crime of violence (as defined in section 16 of title 18, United States Code, but not including a purely political offense) for which the term of imprisonment [imposed] is at least 1 year." IIRIRA § 321(a)(3), codified at 8 U.S.C. § 1101(a)(43)(F). Moreover, section 321(b) of the IIRIRA provides that "[n]otwithstanding any other provision of law (including any effective date), the term [aggravated felony] applies regardless of whether the conviction was entered before, on, or after the date of enactment of this Act." IIRIRA § 321(b), codified at 8 U.S.C. § 1101(a)(43). This has been construed as a clear expression that the IIRIRA's expanded definition applies retroactively to convictions entered before its enactment date of September 30, 1996. *See INS v. St. Cyr*, 533 U.S. 289, 319 (2001); *Ngyen v. Chertoff*, 501 F.3d 107, 114 (2d Cir. 2007). Finally, section 321(c) states that this definition applies to "actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred." IIRIRA § 321(c).

In light of this statutory history, it is undisputed that when Tobar-Barrera registered for ABC benefits in 1991, his conviction for manslaughter did not constitute an "aggravated felony" under the INA. On the other hand, Tobar-Barrera's conviction clearly fits the IIRIRA's expanded definition of "aggravated felony."[7] Therefore, the determinative issue in this case is

---

[7] Tobar-Barrera pled guilty to Manslaughter While Armed in 1986. His sentence was enhanced under the District of Columbia's sentence enhancement statute, which covers "[a]ny person who commits a crime of violence, or a dangerous crime," D.C. Code § 22-3202, and he was sentenced to prison for a period of between six and one half years and nineteen and one half years. Tobar-Barrera's felony offense, whether classified as an involuntary or voluntary manslaughter under District of Columbia law, fits the definition of a crime of violence under 18 U.S.C. § 16(b). Therefore, Tobar-Barrera's conviction is an "aggravated felony," as defined in § 321(b) of the IIRIRA.

whether the pre or post-IIRIRA definition for "aggravated felony" should be applied to Tobar-Barrera under the terms of the ABC agreement.

## II.     Interpretation of Paragraph 2 of the ABC Agreement

The settlement agreement published in *American Baptist Churches v. Thornburgh*, 760 F. Supp. 797 (N.D. Cal. 1991) resolved a massive class action litigation concerning "systemic challenges to the processing of asylum claims filed by Salvadorans and Guatemalans pursuant to the Refugee Act of 1980 and the regulations promulgated thereunder." *Id.* at 799.  The consent decree set forth the agreed-upon terms regarding the future adjudication of eligible Guatemalan and Salvadoran class members.[8]  Among the benefits provided under the agreement, is a de novo asylum adjudication before an Asylum Officer (ABC agreement ¶ 2) and administrative closure of deportation proceedings "until the class member has had the opportunity to effectuate his or her rights" under the agreement (ABC agreement ¶ 19).

"A consent judgment, though it is a judicial decree, is principally an agreement between the parties." *SEC v. Levine*, 881 F.2d 1165, 1178 (2d Cir. 1989).  Therefore, "as is the case in interpreting contracts, a court must look to the plain meaning of the language used in the agreement when interpreting a consent decree." *Wilder v. Bernstein*, 153 F.R.D. 524, 527 (S.D.N.Y. 1994).  In addition, contracts entered into with the United States government are governed by federal law. *United States v. Seckinger*, 397 U.S. 203, 209 (1970).  The central goal of contract interpretation is to discern the intent of the parties at the time they entered into the contract. *Firestone Tire & Rubber Co. v. United States*, 444 F.2d 547, 551 (1971).

---

[8] One observer has described the settlement as representing a "stunning victory for Salvadoran and Guatemalans seeking fair adjudication of their claims to asylum in the United States." Carolyn Patty Blum, *The Settlement of American Baptist Churches v. Thornburgh: Landmark Victory for Central American Asylum-Seekers*, 3 Int'l J. REFUGEE L. 347, 355 (1991).

The first paragraph of the ABC agreement defines its "class members" as "all Salvadorans in the United States as of September 19, 1990 . . . and all Guatemalans in the United States as of October 1, 1990." ABC Agreement ¶ 1. By virtue of the fact that Tobar-Barrera was present in the United States as of October 1, 1990, he qualifies as a "class member" under paragraph 1 of the agreement. Nevertheless, the terms of the agreement require class members to meet certain additional requirements in order to become eligible for ABC benefits.

On September 6, 1991, Tobar-Barrera secured his first benefit under the ABC agreement when the Immigration Judge ("IJ") administratively closed his pending deportation proceeding. By determining that Tobar-Barrera was eligible for this relief, the Immigration Judge had made a finding, under paragraph 19 of the ABC agreement, that he had not been convicted of an "aggravated felony." (ABC agreement ¶ 19.) There is no dispute that the Immigration Judge properly complied with this provision of the agreement in 1991.

However, the opposite determination was rendered in 2007, when the USCIS notified Tobar-Barrera that he was ineligible for a de novo asylum adjudication because his 1986 conviction for manslaughter classified as an "aggravated felony as defined in the INA, as amended." (Pl.'s Ex. C.) An assessment of this decision depends upon a close analysis of the language of paragraph 2 of the agreement, which provides, in pertinent part:

> 2. CLASS MEMBERS ELIGIBLE FOR DE NOVO ASYLUM ADJUDICATION. The following class members, if they have not been convicted of an aggravated felony as that term is defined in the Immigration and Nationality Act, *as amended*, will be afforded a de novo, unappealable asylum adjudication before an Asylum Officer, including a new interview, under the regulations in effect on October 1, 1990:
> . . .
> b. Guatemalans who indicate to the INS in writing their intent to apply for a de novo asylum adjudication before an Asylum Officer, or otherwise to receive the benefits of this agreement, within the period of time commencing July 1, 1991 and ending on December 31, 1991.

9

(ABC agreement ¶ 2, emphasis added.)  Therefore, to qualify for a de novo asylum adjudication, a Guatemalan class member: (1) must register, or otherwise indicate his or her intention to apply for a de novo asylum adjudication before an Asylum Officer, before December 31, 1991;[9] and (2) must not have a conviction that classifies as an "aggravated felony."[10]  (ABC agreement ¶ 2.)

The central dispute in this case concerns the definition of "aggravated felony" in paragraph 2.  The government claims that the definition for "aggravated felony" must be derived from the INA in its current form, as it has since been amended by the IIRIRA.   They base their claim on the inclusion of the phrase "as amended" in paragraph 2, which, in their view, incorporates all subsequent revisions to the INA.

However, this Court reaches the opposite conclusion and finds that "as amended" refers to the meaning of "aggravated felony" as it was defined by the INA in its amended form at the time the ABC agreement was executed.  This interpretation is reinforced by the language in the same paragraph requiring that the de novo asylum regulations be conducted "under the regulations in effect on October 1, 1990."  The two phrases together support the view that the parties intended for asylum officers to apply—in all future asylum adjudications under the agreement—the definitions and procedures that existed at the time the consent decree was issued.

If the parties intended to incorporate future revisions of the term, they could have included the phrases, "as may be amended hereafter" or "as amended from time to time."  The parties were well aware of how to incorporate by reference subsequent revisions to a term or law;

---

[9] While the language in ABC agreement ¶ 2b specifically states that Guatemalans must indicate their intent to apply for an asylum adjudication "within the period of time commencing July 1, 1991 and ending on December 31, 1991," this time frame has been construed as requiring Guatemalan class members to apply before December 31, 1991. *See Chaly-Garcia v. United States*, 508 F.3d 1201, 1204 (9th Cir. 2007).

[10] Paragraph 2 also states that "[c]lass members apprehended at time of entry after the date of preliminary approval of this agreement shall not be eligible for the benefits hereunder."  This additional eligibility requirement is not of relevance in this case.

such specific language was utilized in paragraph 18(e), which provides that "Applications for employment authorization . . . will be governed by the provisions of the regulations that became effective on October 1, 1990, *or as subsequently amended*." ABC agreement ¶ 18(e) (emphasis added).  To make sense of the different phrases used in paragraphs 2 and 18(e), the phrase "as amended" in paragraph 2 must be construed as referring to the definition of "aggravated felony" in 1991, instead of referring to any future definitions of the term in later versions of the INA. *See, e.g*, *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.,* 499 F.3d 1151, 1156-57 (10th Cir. 2007) (observing that, "[w]hen a contract uses different language in proximate and similar provisions, we commonly understand the provisions to illuminate one another and assume that the parties' use of different language was intended to convey different meanings"); *Taracorp, Inc. v. NL Industries, Inc.*, 73 F.3d 738, 744 (7th Cir. 1996) (noting that "when parties to the same contract use such different language to address parallel issues . . . it is reasonable to infer that they intend this language to mean different things").

It is reasonable to infer that the parties to the ABC agreement intended for the law and regulations that existed in 1991 to apply to all future asylum adjudications.  When construing a consent decree, a court may consider certain aids to construction, including "the circumstances surrounding the formation of the consent order." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975).  In July of 1990, the INS published new asylum regulations that changed the procedures for processing asylum requests.  55 Fed. Reg. 30,674-87 (27 Jul. 1990).  These regulations, which became effective on October 1, 1990, were understood "to be a departure from past practices, practices for which the INS had been criticized, and to represent a final realization of the humanitarian mission of the Refugee Act."  Carolyn Patty Blum, *The Settlement of American Baptist Churches v. Thornburgh: Landmark Victory for Central*

*American Asylum-Seekers*, 3 INT'L J. REFUGEE L. 347, 355 (1991).  The regulations also served to promote settlement negotiations and Judge Robert Peckham noted their significance in the preamble to his opinion.  *See American Baptist Churches*, 760 F. Supp. at 799.  Thus, it is apparent that the parties sought to incorporate immigration law and regulations as they existed at the time the consent decree was rendered and thereby solidify their respective obligations and expectations under the agreement.

Accordingly, the USCIS did not comply with the terms of the ABC agreement when it issued its ineligibility determination, as it is undisputed that Tobar-Barrera's conviction did not classify as an "aggravated felony" at the time the ABC agreement was executed.  Tobar-Barrera is therefore deemed eligible for a de novo asylum adjudication under paragraph 2 of the ABC agreement.

### III.     Application of "Aggravated Felony" in Section 321 of the IIRIRA

Even if this Court were to assume that paragraph 2 of the ABC agreement incorporated later definitions of "aggravated felony," the USCIS's application of IIRIRA § 321 to Tobar-Barrera's case would still be improper.  This alternative ruling is based upon a close analysis of the language of this statutory provision and the unique circumstances of this case.

As noted above, § 321(a) of the IIRIRA expanded the definition of "aggravated felony" and § 321(b) unambiguously states that the definition refers to convictions predating the IIRIRA's enactment in 1996.  *See INS v. St. Cyr*, 533 U.S. 289, 319 (2001); *Ngyen v. Chertoff*, 501 F.3d 107, 114 (2d Cir. 2007).  Nevertheless, subpart (c) of this section limits the definition, by stating that it may only apply after a certain effective date:

> (c) EFFECTIVE DATE – The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act [September 30, 1996], regardless of when the conviction occurred . . . .

IIRIRA § 321(c).  This Court concludes that because there was no "action taken" in Tobar-Barrera's case after September 30, 1996, the post-IIRIRA definition of "aggravated felony" was improperly applied by the USCIS.

The meaning of this phrase "actions taken" was never explained by Congress and it is an interpretive issue of first impression in the Fourth Circuit.  However, this Court is persuaded by the view espoused by the Sixth Circuit, as recently enunciated in *Saqr v. Holder*, 580 F.3d 414, 420-422 (6th Cir. 2009), a case involving analogous facts.  In *Saqr*, the alien petitioner appealed the BIA's decision upholding an immigration court's determination that he was removable because he had a conviction that classified as an "aggravated felony" under post-IIRIRA definition.  The Sixth Circuit reversed, holding that the post-IIRIRA definition did not apply because the relevant "action taken" occurred when Saqr's removal proceedings were initiated.[11]  Because Saqr's proceedings were initiated before the IIRIRA's enactment in 1996, the pre-IIRIRA's definition of "aggravated felony" applied to his case.  *See Saqr*, 580 F.3d at 422 ("the term 'action taken' appears to this court to derive from the point at which the removal action begins for purposes of determining whether the pre- or post-IIRIRA definition of aggravated felony applies").  The court noted that removal proceedings are initiated at the time when an alien is provided with written notice to appear before an IJ, through an order to show cause, notice to appear, or by the issuance of an arrest warrant.  *Id.* at 421-22 (citing *Alanis-Bustamante v. Reno*, 201 F.3d 1303, 1310 (11th Cir. 2000); *Wallace v. Reno*, 194 F.3d 279, 287 (1st Cir. 1999)).

---

[11] The Sixth Circuit reached the same conclusion in *Tran v. Gonzales*, 447 F.3d 937, 941 (6th Cir. 2007), where it reasoned: "Section 321(c) explicitly limits the application of the revised definition of 'aggravated felony' to proceedings initiated after September 30, 1996 . . . . Section 321(c) explicitly limits the expanded definition of 'aggravated felony' to prospective deportation proceedings."

An application of the Sixth Circuit's interpretation of "actions taken" to the present facts leads to the conclusion that the post-IIRIRA definition of "aggravated felony" was improperly invoked in this case. Tobar-Barrera's deportation proceedings were initiated in 1990, when he was served with an order to show cause that was duly filed with the Immigration Court. (Def.'s Ex. A.) In 1991 the Immigration Court administratively closed Tobar-Barrera's deportation proceedings. However, as the government notes, a deportation proceeding that has been administratively closed remains pending. *See* Def.'s Resp. at 20 n.8 (quoting *Matter of Amico*, 19 I&N Dec. 652, 654 n.1 (BIA 1988) ("[t]he administrative closure of a case does not result in a final order. It is merely an administrative convenience that allows the removal of cases from the calendar in appropriate situations")). Therefore, when Tobar-Barrera's case was recalendared in 2009—eighteen years after it was administratively closed—his case was merely resumed instead of re-initiated. This is evidenced by the fact that Tobar-Barrera has had the same case number (#A 070-307-192) for approximately the past twenty years. Thus, the relevant "action taken" against Tobar-Barrera occurred in 1990, meaning that the pre-IIRIRA definition must apply to his case.

This Court is aware that other circuit courts have interpreted the meaning of "actions taken" in § 321(c) more broadly than the Sixth Circuit. The Third Circuit has recently followed the example of the Fifth Circuit in interpreting "actions taken" to mean "orders or decisions of the IJ or BIA which apply the 'aggravated felony' definitions . . . ." *Biskupski v. Attorney General*, 503 F.3d 274, 283 (3rd Cir. 2007) (citing *Garrido-Morato v. Gonzales*, 485 F.3d 319, 324 (5th Cir. 2007) (stating that "actions taken" refers to "actions and decisions of the Attorney General acting through an immigration judge or the BIA")); *see also Valderrama-Fonseca v. I.N.S.*, 116 F.3d 853, 856-57 (9th Cir. 1997) (stating that an "action" under § 321(c) "refers to

orders and decisions issued against an alien by the Attorney General acting through the BIA or Immigration Judge"). However, even under this broader interpretation, the post-IIRIRA definition would still not be triggered in Tobar-Barrera's case. The post-IIRIRA definition was applied to deny Tobar-Barrera's eligibility under the ABC agreement in a *sua sponte* decision by the USCIS, a component of the Department of Homeland Security. The determination was not rendered through "a final agency order . . . issued by either an IJ or the BIA." *Biskupski*, 503 F.3d at 283. While an IJ did render a written decision denying Tobar-Barrera's motion to reconsider his bond re-determination, Def.'s Ex. D, this could not be an "action taken" under the interpretation proposed by the Third and Fifth Circuits, because the IJ did not apply or consider the definition of "aggravated felony" in her decision.[12]

## CONCLUSION AND REMEDY

Based on the foregoing, Tobar-Barrera's Petition for Writ of Habeas Corpus is DENIED and his Complaint for Declaratory and Injunctive Relief is GRANTED IN PART and DENIED IN PART. This Court enters declaratory judgment in favor of Tobar-Barrera and against the government. The USCIS failed to comply with paragraph 2 of the ABC agreement when it determined that Tobar-Barrera was ineligible for a de novo asylum adjudication. Tobar-Barrera does not have an "aggravated felony," as defined under paragraph 2 of the ABC agreement; therefore he is eligible for, and entitled to, a de novo asylum adjudication.[13]

Having reached this conclusion, the question of remedy arises. In accordance with their hybrid nature, consent decrees "are construed largely as contracts, but are enforced as orders." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985). It is well-established that "[e]nsuring

---

[12] In her opinion, the Immigration Judge stated that "[e]ven if it cannot be considered an aggravated felony, [Tobar-Barrera] has not met his burden of demonstrating by clear and convincing evidence that would not pose a danger to property or persons." (Def.'s Ex. D.)

[13] Because of this holding, Tobar-Barrera can no longer complain of any constitutional injury, and his constitutional claims are therefore rendered moot.

compliance with a prior order is an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Id.* (citing *Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir. 1983)). This Court has been petitioned, pursuant to paragraph 35 of the ABC agreement, to protect the integrity of the settlement entered by the U.S. District Court for the Northern District of California by ensuring compliance with the ABC agreement. Therefore, this Court invokes its broad discretionary powers and hereby compels the government to provide Tobar-Barrera with a de novo asylum adjudication in accordance with the terms of the ABC agreement. This adjudication must be initiated within 30 days of the issuance of this Memorandum Opinion and accompanying Order. This equitable relief comports with the "special blend of what is necessary, what is fair, and what is workable" under the unique circumstances of this case. *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973). Tobar-Barrera has waited over *nineteen years* to receive the benefits that he is owed under the ABC agreement. On the other hand, the government will not be unduly burdened by this ruling. If Tobar-Barrera is denied asylum as a result of the de novo adjudication, his deportation proceedings may proceed with his scheduled April 14, 2010, hearing before the Baltimore Immigration Judge. A separate Order follows.

Date : March 12, 2010                                        /s/_____
                                                             Richard D. Bennett
                                                             United States District Judge